# EXHIBIT A

TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX .............., ss

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No.   15-00195



VIVIANE RODRIGUES, Indivdually
and on Behalf of Class Members
........................................., Plaintiff(s)

v.

WELLS FARGO BANK, N.A.,
et al.......................................... , Defendant(s)

## SUMMONS

To the above-named Defendant:      Wells Fargo Bank, N.A.

You are hereby summoned and required to serve upon ......Evans J. Carter, Esq................
Evans J. Carter, P.C. ................ plaintiff's attorney, whose address is ....860 Worcester Road,..
P.O. Box 812, Framingham, MA 01701
.........................................................., an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at 200 Trade Center
Woburn, MA
.......................................................................... either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness, **Barbara J. Rouse**, Esquire, at .........Woburn, MA..........................................
the ......21st.................................. day of ...........January...................................
..................., in the year of our Lord .........2015......................... .

..........................................................................
Clerk

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all such defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

FORM NO. SUP. — 001

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION NO. 15-_00195_

VIVIANE RODRIGUES, Individually and on
Behalf of Class Members,

Plaintiff,

v.

WINGS NETWORK;
WINGSNETWORK;
WINGSNETWORK.COM
WINGSNETWORKGLOBAL.COM
TROPIKGADGET;
SUCCESS WEALTH101, INC.;
GRUPO INTERNACIONAL;
SERGIO TANAKA;
VINICUS AGUIAR;
THAIS AGUIAR;
GEOVANI BENTO;
PRISCILA BENTO;
CARLOS LUIS DA SILVEIRA BARBOSA;
JP MORGAN CHASE BANK, N.A.;
WELLS FARGO BANK, N.A.; and
JOHN DOES 1-75 Who Acted as Agents for
Wings Network,

Defendants.

**COMPLAINT, JURY CLAIM AND
REQUEST FOR CLASS ACTION
CERTIFICATION**

## I. INTRODUCTION AND OVERVIEW OF ACTION

1.     The plaintiff bringd this action on behalf of herself and on behalf of all others

similarly situated who reside within the Commonwealth of Massachusetts and who have

invested in Wings Network ("Wings").  The plaintiff has invested approximately $20,000 herself

into Wings and approximately $175,000 for other Wings' investors.

2.     The defendants, jointly and severally, sold, marketed, advertised or aided and

abetted in the sale of securities in the form of beneficial interests in Wings.

3.     The defendants, jointly and severally, managed, controlled, marketed and aided and abetted and continued enrolling new investors/members into Wings. The Securities Division of the Massachusetts Office of the Secretary of State, on or about May 15, 2014 filed an administrative complaint (Docket No. E-2014-0037) against Wings and some of its principals alleging fraudulent activities of Wings' principals in connection with the offer and sale of securities targeting the Spanish and Portuguese-speaking communities in the Commonwealth. The principals offered a multilevel marketing business opportunity called "Wings," which is a multilevel marketing scheme to target minority communities.

4.     According to information provided by Wings, within five (5) months of starting its operations, a total of $12,546,226.00 had been collected by Wings from eight thousand nine hundred and fourteen (8,914) Massachusetts investors.

5.     Wings purportedly offers for sale a product involving technologically advanced and innovative mobile marketing platforms that allow consumers to download electronic content for a fee.  However, the product is ancillary to the business of recruiting other investors to become participants in Wings by purchasing one of the starter packages.  The marketing materials, online selling presentations and assertions by the principals make it clear that the primary purpose of Wings is to recruit additional members.  Furthermore, the opportunity can only be realized if the prospective investors make mandatory payments for a starter package and pay a membership fee.  Wings is a multilevel marketing business opportunity, which  is actually a thinly veiled pyramid scheme.

6.     The use of trendy internet terms combined with meaningless high technology buzzwords and slick websites are all devices to dazzle prospective investors and induce them to

purchase their way into the Wings scheme.  The product itself is redundant because it is not necessary to use any product.

7.     On or about May 15, 2014, The Securities Division of the Massachusetts Office of the Secretary of State closed down Wings' operations and sale of membership interests.

8.     Wings is a Pyramid/Ponzi scheme as defined by the U.S. Securities and Exchange Commission, of copy of which definition is annexed hereto and marked as <u>Exhibit A.</u>

## II. PARTIES

9.     The plaintiff, Viviane Rodrigues, resided at 615 Main Street, Clinton, Worcester County, Massachusetts.  She invested approximately $20,000 into Wings for her membership interest and approximately $175,000 as agent for other Wings' investors.

10.     The defendants, Wings Network, WingsNetwork, Wingsnetwork.com and Wingsnetworkglobal.com (collectively "Wings") are multilevel marketing business names and websites created and paid for by defendants Sergio Tanka ("Tanks") Carlos Luis da Silveira Barbosa ("Barbosa").

11.     Tropikgadget refers to Tropikgadget FZE and Tropikgadget Unipessoal LDA located at P.O. Box 53855, Office No. E-12F-37, Hamriyah Free Zone, Sharjeh, United Arab Emirates and with an additional location in Moranda Cminho Do Engenho Velho 24, Madeira Portugal.  Tropikgadget also maintains administrative headquarters at Avenida D. Joao II 1.06.25B lot, Building Red Sea - 1st Floor B, 1990-095, Lisbon, Portugal.  Tropikgadget holds rights to Wings' marketing and brand services and operates through Wings.  Tanka is the founder of Tropikgadget.

12.     The defendant, Success Wealth101 Inc., was incorporated in Massachusetts on December 5, 2013 and its offices were located at 119 Prospect Street, Marlborough,

Massachusetts 01752.  The defendant, Geovani Bento, is listed as the President, Treasurer, Secretary, and Director.

13.    The defendant, Grupo Internacional, refers to Eagle Team and Grupo Aguiar and all three (3) have done business under the Wings' business of the defendants.

14.    The defendant, Sergio Tanka ("Tanka") is an individual with a United States addresses in Sunny Isles, Florida and Davie Florida. Under the umbrella of SAWA BONA, he purportedly owns fourteen (14) companies: Seta Points, Aikon LLC, Wings Network, Sawabona Resources Mining, 7 Payment Processor, Louvre ECO, Coaching Club, Seta Global Sports, Teleactiva Portugal, Real Emperor, Data Center, Inst. Investigacao Sawabona, RHMTEC MMN and TNK Communicacao. Tanaka is also one of the founders of Tropikgadget that operates its business through Wings and associated individuals and business entities. In the United States, Tanaka is also listed as a corporate officer of the PDT 5204 LLC, a limited liability company organized in Florida on September 6, 2013 with a location at 21301 Powerline Road, Ste. 207, Boca Raton, Florida 33433. Tanaka is also listed as a corporate officer of Echo 406 LLC, a limited liability company organized in Florida on October 10, 2013 with a location at 21301 Powerline Road, Ste. 207, Boca Raton, Florida 33433. Tanaka is also listed as a corporate officer of Aikon LLC, a limited liability company organized in Florida on October 25, 2013 with a location at 21301 Powerline Road, Ste. 207, Boca Raton, Florida 33433.

15.    The defendants, Vinicius Aguiar and his wife Thais Aguiar (collectively "Aguiar"), are individuals with a business address at 223 Main Street, Marlborough, Massachusetts 01752; 200 E. Main Street, Suite 14, Marlborough, Middlesex County, Massachusetts 01752 and 14 Hudson Street, Marlborough, Massachusetts 01752. They also has a residential address in Marlborough, Massachusetts.  Accordingly to the corporations records of the Massachusetts

Secretary of State, Aguiar operated a company call BRAZUSA Communication Company from July 25, 2009 through April 24, 2014. He also uses the names Eagle Team, Grupo Aguiar and Grupo Internacional to conduct transactions in the Wings Network Multilevel marketing scheme. The Aguiars are listed as Directors of Wings Network in the February 2014 Wings Network magazine call "Connect."

16.     The defendant, Geovani Bento, is a Massachusetts resident who has addresses located in Auburn and Marlborough, Massachusetts and he is a Brazilian national and according to his sworn testimony, he is not permitted to work in the United States.

17.     The defendant, Priscila Bento, is a Massachusetts resident who has addresses in Auburn and Marlborough, Massachusetts. Defendant Priscila Bento is a Brazilian national and according to her sworn testimony, she is permitted to work in the United States.

18.     The defendant, Carlos Luis da Silveira Barbosa ("Barbosa") is an individual residing in Portugal. He is listed on the Wings Network website as the CEO of Wings Network and is listed as a member of the Economists Order of Portugal with twenty years (20) of experience in the market (market is not defined in any Wings Network materials). Barbosa was videotaped in April, 2014 in Boston giving a Wings' presentation.

19.     The defendant, JP Morgan Chase Bank, N.A., is a national bank with offices at 41 First Avenue, Needham, Massachusetts. At all times material hereto, the defendant JP Morgan Chase Bank, N.A., provided banking services, maintained accounts, received and executed transfers of funds for the benefit of Wings.

20.     The defendant, Wells Fargo Bank, N.A., is a national bank with offices at 50 Braintree Hill Office Park, Braintree, Massachusetts. At all times material hereto, the defendant

Wells Fargo Bank, N.A., provided banking services, maintained accounts, received and executed transfers of funds for the benefit of Wings.

21.     The defendants, John Does 1-75, are individuals who acted as agents for Wings.

## FACTUAL ALLEGATIONS

22.     The defendants, Tanaka and Barbosa have claimed to be the owners and/or managers of Tropikgadget and Wings and Tanaka also claims to be the owner of SAWABONA, an umbrella organization that includes Wings and Tropikgadget.

23.     The defendant, Barbosa, is the CEO of Wings according to the Wings website and online presentations.

24.     The defendant, Tropikgadget, operates its business through Wings and associated individuals and business entities. According to the Wings website, Tropikgadget has its administrative headquarters in Madeira Island, Portugal and its tax headquarters in Dubia, U.A.E.

25.     The business license of Tropikgadget was reported as revoked in Madeira, Portugal on April 29, 2014.

26.     The Wings website states that Tropikgadget "holds marketing rights to the product and brand services of the trademark Wings Network" and that Tropikgadget "operates through Wings Network with digital products and services.

27.     The defendants, Geovani and Priscila Bento (the Bentos), are promoters and presenters of Wings operating in Massachusetts and they operate through defendant, Success Wealth 101, Inc., a Massachusetts corporation.

28.     The Aguiars, are also promoters and presenters of Wings operating in Massachusetts, and they do business under the names of Grupo Internacional, Eagle Team and

Grupo Aguiar.

29.     According to the February 2014 "Connect" magazine, the Aguiars have attained Wings Network compensation level of "Directors."

30.     On information and belief, at least eight thousand nine hundred fourteen (8,914) Massachusetts investors have joined Wings.

31.     Massachusetts residents were specifically targeted through a Wings event held in Boston on or about April 5, 2014. According to the Wings Network "Connect" magazine, 960 people attended the event which was organized by the Aguiars.   It is noteworthy that both Barbosa and Tanaka also attended and spoke at this event.

**A.     Solicitation of Investors**

*1.  Introduction to the Wings Network Pyramid Scheme*

32.     Wings claims to sell mobile and online platforms that allow subscribers to purchase movies, apps, games, and e-books.

33.     Certain Wings materials and presentations also state that Wings investors make money through royalties on every downloaded movie, e-book, app, or game.

34.     Nowhere on its websites, marketing materials or presentations does Wings explain how it obtains royalties on electronic content.

35.     Upon information and belief, Wings does not own the rights to sell the electronic content that it claims to sell.

36.     The products that Wings sells are described vaguely as "unique highly consumable in demand products." However, movies, e-books, apps, and games are easily downloaded every day by consumers without using Wings products or services.

37.     The cost of products or services cannot be found in any Wings' materials,

advertisements or presentations.

38.     Because it is not necessary to sell the product in order to make money though Wings, participants are advised not to concern themselves with product sales, but to immediately start making money by purchasing the Elite package which pays their way into the "Consultant" level of the compensation plan. From there, Massachusetts investors were told that even more money could be made by recruiting new participants and inducing them to purchase Wings Network starter packages.

39.     Many Massachusetts investors were introduced to Wings through the Bentos from February through April of 2014, the Bentos and the Aguiars made a Wings' presentations at a Somerville, Massachusetts, hotel.

40.     Rental of the meeting rooms for Wings' presentations at the Somerville, Massachusetts hotel were paid for by the Bentos and the Aguiars and other Wings' promoters.

41.     In addition, the Bentos and the Aguiars also went door-to-door in Spanish and Portuguese-speaking communities in the Boston and Metrowest areas to induce Massachusetts residents to join Wings through the purchase of starter packages.

42.     The Bentos and the Aguiars would also make informal group presentations held at the houses of new participants to recruit investors to purchase Wings starter packages.

43.     In addition, some Massachusetts investors also logged onto the web to view Wings webinars and online presentations offered by the Bentos and the Aguiars prior to purchasing starter packages.

44.     The Bentos and the Aguiars initially required the participant to complete a "Pre-Registration" form and pays for his or her starter package. Almost all Massachusetts investors purchased the Elite package.

45.     Massachusetts investors paid by cash, check or wire transfer to bank accounts controlled by the defendants.

46.     Once an investor paid to join Wings, usually at the Elite level, the investor received access to the "Back Office" area of the Wings' website.

47.     Through the Back Office, the investors could view the number of points in his or her account and through the Recruiter portion track the number of people that he or she sponsored and make sure that the points had been correctly awarded.

48.     These points translate directly to dollars: 1 point equals $1.00.

49.     New participants were required to give the name of their sponsor prior to logging in for the first time.

50.     In order to be paid, Massachusetts investors were required to transfer their points to the Bentos and/or the Aguriars Wings' account. After they received these points and paid the investor either with a check or in cash.

51.     However, in all payouts involving Massachusetts investors, the money paid to investors was less than the points transferred and substantially less than the amount guaranteed ($750.00 per month) before becoming an investor.

### 2. Recruitment of New Participants

52.     A review of the sales materials, websites and presentations reveals that the actual cost of the product is not provided.

53.     The sales materials, websites and presentations describe the market for the products and make vague statements about the retail product and services, but most of the materials focus on the recruitment of additional participants.

54.     The Wings website states, "[t]he way to do the business is run through

Independent Associates. It is important to understand that your success and the success of your fellow Associates depend on the integrity of the people who *market* our Products and Services." (sic), (emphasis added).

55.     Massachusetts investors believed that recruitment of additional Elite package purchasers was how they could make money and none of the known Massachusetts investors expected any income from product sales.

### 3. *Materials Provided by the Defendants.*

56.     The "Overview of the Wings Network" section of the marketing materials provided to Massachusetts investors states:

> The markets we participate in
>
> - Mobile apps & application development
> - Streaming video & online gaming
> - Cloud data storage contracts
> - Personal Web development tools
> - Small business web development tools
> - Business recruiting and marketing tools

57.     The "Recruiting" handout provided to Massachusetts investors explains in detail how to find recruits, provides some sales scripts, and provides advice on how to interest the new recruit.  For example, the recruiting handout states that participants should base their Wings Network introductory conversations on the following:

> A group of local business people have been asked to LAUNCH a new International Company here in the U.S. They are the top people in the industry and are putting the LEADERSHIP team together right now. I thought of you immediately. They are showing a select group of people the business model Thursday Night at 7-ARE YOU AVAILABLE???

58.     In addition, two invitation scripts are provided to the participants to help with the recruiting process. Both of them state, "[t]he business pays us royalties on virtual products like online movies and gaming. The company is opening in a few weeks - so we are truly in on the

ground floor."

59.    The marketing materials provided to Massachusetts investors also included a handout titled "Business Steps" that emphasize only the recruiting aspect of Wings Network. It states that once the participant purchases the Elite package and recruits six other people to invest at the Elite package level, $550.00 will be paid out *daily* to the participant.

60.    This same "Business Steps" handout provides a place to start gathering names and numbers using another handout titled "Recall Sheet." The Recall Sheet lists two columns of types of people that the participant should contact to help generate leads. A few examples include:

> Who is dissatisfied with their job
> Who is unhappy with their income
> Who was laid off
> Who was injured at work
> Who works too hard
> Who lives in your neighborhood
> Who you met on the street
> Who has lots of friends

61.    Many of the Massachusetts investors viewed online videos and presentations before deciding to join Wings Network.

62.    Statements from online presentations include:

> A true ground floor opportunity. It's a perfect storm of leadership combining with technology and services in perfect timing.
> *The number of people you personally bring into this company is unlimited. Meaning this money is unlimited also.* (Emphasis added.)
> This is gonna be a worldwide multilevel marketing company . . . there's a lot of top leaders that will be joining this company and you need to lock in your position as soon as possible because this thing is gonna go haywire.

63.    None of the presentations offer basic information on the product, focusing instead on the recruitment of other investors to join Wings Network.

-11-

### 4. *Minimum Recruitment Effort Required to Reap Profits*

64.     Massachusetts investors were told by the defendants that it was not necessary to sell any products to achieve guaranteed income.

65.     In addition, the defendants warranted that even though each investor could recruit as many people as he or she wanted to, it was only necessary to enroll two Elite package purchasers to start making $750.00 a month.

66.     The "Overview" of the Wings Network marketing materials states "[a]s few as two people can complete your organization!"

67.     The "Overview" of the Wings Network marketing materials further states, "Add one Elite Member per team (or a total of 500 points) and earn $750 per month through the first year of activity."

68.     In addition, online presentation videos emphasize that little work is necessary to immediately start making $750.00 per month, stating:

> This is an amazing opportunity where we go out and make true residual income on services people not only need but are addicted to.    Imagine having one conversation with somebody, getting a customer once, *sharing a service one time and getting paid month after month over and over again.* (Emphasis added.)
>
> About the Quick Start Bonus: "I love this because it's *immediate income. . .* every independent representative that you personally bring into this opportunity, they're gonna pay you *bonus money.* (Emphasis added.)
>
> Once the products are out and company is launched and you refer someone to just the product, you earn 50% commissions.
> We will have the opportunity to sell in two different ways. Being a product of the product, using Wings' products yourselves and offering to your friends, family members and others and you will have an automated system on the internet that will work for you. *It will be selling the products for you.* This is very good because even without you being present, you will be selling the different types of products. (Emphasis added.)

Basically commit to the business, 7-10 hours a week for one year. You'll become a chairman.

*No pressure, business sells itself... invest risk free!* . . Does not take much to start making consultant bonuses ... set yourself up with **guaranteed $750 residual income** in the first month . . . all the work there is . . . sponsor two people and make $750 every month, every month. (Emphasis added.)

69. The defendants and other promoters through online presentations told Wings Network participants that Wings Network would take care of all the technology and creation of apps, games and cloud services.

70. Recent presentations such as those produced in April of 2014 state that one of the products that would help participants make money is the "Wings Communicator" described as a combination of Skype, WeChat, WhatsApp, and WAZE. Online presentations claim that "Wings Communicator will play a major role in the launch of Wings to the world and *explode each members' profits exponentially* " (emphasis added).

71. On information and belief, the Wings Communicator is not an actual product or service and the use of Skype, WeChat, WhatsApp, and WAZE company names and logos are without permission.

B. **Terms of the Offering**

1. *Structure of the Pyramid Scheme*

72. Defendants purportedly offered four (4) types of packages. The participant levels are as follows:

-13-

| Membership | $49.00 |
|---|---|
| Start Package | $299.00<br><br>Full personal page system with 1 template version<br>Complete recruiting system including 1 landing page, an auto-responder<br>full automated system, 2 banners and 2 facebook covers<br>Voice and video group calls and instant messages, compatible with IOS and Android<br>10 GB of file storage in the cloud |
| Executive Package | $749.00<br><br>Full personal page system with 3 template versions<br>Complete recruiting system including 3 landing pages, an auto-responder<br>full automated system, 4 banners and 4 facebook covers<br>Voice and video group calls and instant messages, compatible with IOS and Android<br>20 GB of file storage in the cloud |
| Elite Package | $1499.00<br><br>Full personal page system with 6 template versions<br>Complete recruiting system including 6 landing pages, an auto-responder<br>full automated system, 10 banners and 10 facebook covers<br>Voice and video group calls and instant messages, compatible with IOS and Android<br>40 GB of file storage in the cloud |

73.   The Wings' presentation on their website explicitly states that participants receive 50% of the points garnered for product sales, but only if the membership level alone is purchased.

74.   Wings' presentations and websites state that participants may join by purchasing a membership for $49.00 and earn money on product sales. However, Wings Network marketing materials and promoters state, "$49 one-time registration, plus the selection of one of three

-14-

packages, all of which include varying levels of services and compensation plans" indicating that purchase of the membership alone is not an option.

75. This inability to enter in at membership level, the only level with any compensation tied to sales of the product, underscores that there is no viable product and that the entire scheme rests upon the recruitment of new participants.

76. In addition, even though three starter packages are presented to prospective investors, almost all of the investors purchased the Elite package which is also the most expensive at $1499.00. The Elite package is supposedly the most lucrative and offers the most benefits since it is first package level that offers residual income or income from recruitment.

77. All of the known Massachusetts investors stated that defendants advised that they talk about any other package except for the Elite package because that is the package where you "really make money."

78. The defendants aggressively pushed the purchase of the Elite package emphasizing the passive residual income that only comes with that level's Consultant status.

79. On information and belief, defendants do not realize any appreciable revenue from anything other than the sale of starter packages to new investors.

80. All of the known Massachusetts investors were pressured by the defendants to purchase the Elite package and all of them purchased at least one Elite package. (Some Massachusetts investors purchased additional packages with the expectation of earning additional money per month).

81. Online presentations touting the Elite package state:

> [I]f you were an Elite member, for you to make $450 in profit share every month for 12 months, whether you do anything else or not in the business, you would simply need to sponsor 1 Elite on your right

leg and 1 Elite on your left. Make more money is easy by simply helping your members do the same. Be an elite, sponsor two elites. Come in at whatever position you can afford and then sponsor two elites. That's the goal, that's the mission.

82. On information and belief, almost all investors in Wings Network purchase at least one Elite package.

### 2. The Wings Network Compensation Plan

83. The compensation plan describes eight cumulative levels of payment to the participant with an overall emphasis on the large amounts of money each participant will make by recruiting new members to join.

84. The following chart outlines the Wings Network compensation plan.

| Bonus Level | Promised Return |
|---|---|
| Sales Bonus | 50% on the sales of the product |
| Quick Start Bonus | For every person that the participant directly sponsors payments according to the type of package: Start-$10.00 Executive-$25.00 Elite - $50.00 |
| Team Bonus (Binary) | Once the participant has established two participants in his or her downline, the initial participant is paid according to what package level was purchased by those in the smaller downline branch: Start-25% Executive - 35% Elite-50% |
| Group Bonus | Pays out a bonus on each tier of the binary matrix up to 10 tiers Tier 1 - 5% Tier 2-5% Tier 3-5% Tier 4-5% Tier 5-5% Tier 6-5% Tier 7-5% Tier 8-5% Tier 9-3% Tier 10 -2% |

| Consultant Bonus | Monthly payout according to what package level was purchased:<br>Start - 2% or $60.00 - $150.00<br>Executive - 5% or $150.00 - $375.00<br>Elite - 15% or $450.00 - $750.00 |
|---|---|
| Generation Bonus | Only paid at the Director Level and above:<br>3% of the group earnings if a sponsored member becomes a Director<br>6% of the group earnings if a sponsored member becomes an Executive or a Director<br>9% of the group earnings if a sponsored member becomes President<br>12% of the group earnings if a sponsored member becomes Chairman |
| Global Bonus | Pay points (equivalent to dollars) based on the number of points that flow through the organization.  For example, if a participant has 150,000 points flowing through the organization, his or her team will receive 1% of the Global Bonus every month. |
| Qualification Prize | One time prizes for participants when they achieve certain levels<br>Supervisor - $1,000.00<br>Senior Supervisor - $2,500.00<br>Manager - $5,000.00<br>Chairman - $1,000,000.00 |

85.     The Wings Network plan of compensation mentions sales of products only once at the Sales Bonus level. The Sale Bonus level is only available with the purchase of only the $49.00 membership fee that is rarely if ever sold alone to investors.

86.     The remaining plan categories describe compensation derived exclusively from recruitment activities.

## C.     Fraudulent Conduct

### 1.     The Defendants' Bank Accounts

87.     The defendants opened bank accounts in their names or entities controlled by them starting on February 27, 2010 (the "Bank Accounts").

88.     Wings Network purchases by individual Massachusetts investors from the defendants that were deposed into the Bank Accounts.

89.     The Bank Accounts' records show deposits in the form or checks, some of which were mailed and some of which were wire transfers, that were payments for joining the Wings Network multilevel marketing scheme.   Most checks were in an amount of $9,900 to avoid bank reporting requirements.

90.     The deposited funds were commingled and pooled into the Bank Accounts and at the defendants' JP Morgan Chase Bank, N.A. and Wells Fargo Bank, N.A.

91.     Funds from the Bank Accounts were used to pay the personal expenses of the defendants.

92.     Also, funds from the Bank Accounts were wire transferred to bank accounts controlled by the Defendants.

93.     Pooled funds from the Bank Accounts were wire transferred to not less than two different bank accounts belonging to the defendants Tanaka and Barbosa.

94.     For example, between December 3, 2013 and December 4, 2013, $22,660.00 was wire transferred from on of the Bank Accounts to the defendant Tanaka's bank account.

95.     On information and belief, some of the cash withdrawn from the Bank Accounts was paid to Massachusetts investors as compensation for participation in Wings Network.

96.     On information and belief, these payments to Massachusetts investors were classic Ponzi payments (payments using new participant funds to pay prior investors).

2.      *The Success Wealth Bank Account*

-18-

97. The defendants also opened at least one Bank Account in the name of the defendant, Success Wealth 101, Inc., on or about December 11, 2013 (the "Success Wealth Bank Account").

98. Payments for Wings Network starter packages by individual Massachusetts investors were deposited in the Success Wealth Bank Account. Success Wealth Bank Account records show deposits in the form or checks and wire transfers that were payments for joining the Wings Network multilevel marketing scheme.

99. The deposited funds were commingled and pooled in the Success Wealth Bank Account.

100. Funds from the Success Wealth Bank Account were used to pay the personal expenses of the defendants.

101. Funds from the Success Wealth Bank Account were wire transferred to other bank accounts controlled by the defendants.

102. Pooled funds from this single account were wire transferred to two different bank accounts belonging to Tanaka and Barbosa.

103. Pooled funds from this single account were wire transferred to bank accounts belonging to Tropikgadget Unipessoal LDA as well.

104. For example, Between January 22, 2014 and March 4, 2014, $208,384.00 was wire transferred from the Wings Network Bank Account to two bank accounts in the name of Tanaka and one bank account in the name of Tropikgadget Unipessoal LDA.

105. On or about January 28, 2014, the Wings Network Bank Account received a wire transfer of $4,060.00 from Tanaka's bank account.

-19-

106.   On or about March 6, 2014, the Wings Network Bank Account received a wire transfer of $13,932.00 from Tanaka's bank account.

107.   The Wings Network Bank Account shows checks made out to Wings Network Investors.

108.   On information and belief, cash withdrawn from the Wings Network Bank Account was paid to Massachusetts investors.

109.   On information and belief, these payments to Massachusetts investors were classic Ponzi payments (payments using new investor funds to pay prior investors).

### 3. Fraudulent Pyramid Scheme

110.   From November 2013 through April 2014, the Bentos collected over $348,460.00 from Massachusetts Wings Network investors.

111.   From December 2013 through April 2014, at least 129 Massachusetts investors paid money to the Bentos to join Wings Network.[1]

112.   During this time, the Bentos paid approximately $27,866.00 out to Wings Investors using checks drawn from the Success Wealth 101 Inc. Bank Account.

113.   During this time, cash payments of between $400.00 to $1,200.00 were made by defendants Bentos to other Wings Network investors.

114.   During this time, $231,044.00 was wire transferred to bank accounts belonging to defendant Tanaka.

115.   From November 2013 through April 2014, the Bentos netted approximately $89,530.00 from their efforts to recruit new Wings participants.

---

[1]129 is a conservative number since it does not account for individual investors that paid cash to join Wings and that cash was subsequently pooled into a single deposit slip.

116.    Bank records show that money from Wings Network investors and deposited into bank accounts controlled by the Bentos was used to pay for personal expenses.

117.    Bank records do not indicate that Wings Network investors were credited for the enrollment of additional participants; instead those monies were deposited into bank accounts controlled by the Bentos.

118.    On information and belief, the defendants paid each other primarily to promote and present Wings Network and recruit Massachusetts resident to purchase Wings Network starter packages.

119.    On information and belief, the defendants Aguiars and Grupo Internacional alone and through their doing business as names of Eagle Team and Grupo Aguiar also offered and sold Wings Network securities to Massachusetts Residents.

120.    On information and belief the scheme operated by the defendants were typical of the Wings Network scheme perpetrated throughout Massachusetts.

121.    Through other Wings Network promoters and members, eight thousand, nine hundred fourteen (8,914) Massachusetts residents invested a total of $12,546,226.00 in Wings Network.

122.    The following chart outlines the amounts made by the Bentos and all promoters above them since the inception of Wings.

| Number | Amount Made |
|---|---|
| 1 (Vinicius Aguiar) | $1,302,880.00 |
| 2 | $791,745.00 |
| 3 | $557,240.00 |

| 4 | $497,925.00 |
|---|---|
| 5 | $434,150.00 |
| 6 | $394,020.00 |
| 7 | $386,715.00 |
| 8 | $370,090.00 |
| 9 | $282,080.00 |
| 10 | $248,795.00 |
| 11 | $236,750.00 |
| 12 | $167,105.00 |
| 13 (Defendants Geovani and Priscila Bento) | $163,845.00 |

**D.** **Material Misrepresentations and Omissions**

123.    Wings Network sales materials state that Wings Network "has already won the pre-approval of the DSA (Direct Selling Association), the industry watchdog in Network Marketing and Direct Sales."

124.    However, the DSA does not have a "pre-approval process."

125.    The DSA also has no member or pending member under the name of Wings Network or any variation of the Wings Network.

126.    The Wings Network website generically states that it "never compensates participants, directly or indirectly, merely for introduction or enrollment of other participants into the program."

127.   This statement is directly contradicted by the Quick Start Bonus described in the above chart that specifically awards monetary compensation to participants for enrolling new participants.

128.   This statement is further contradicted by the defendants who emphasized that the recruitment of new participants Wings Network is the path to great wealth.

129.   The defendants repeatedly claim that a guaranteed income of $750.00 per month can be achieved by every Elite package purchaser who sponsors a minimum of two other Elite package purchasers into the Wings Network program.

130.   No matter what level the participant joined Wings Network at, he or she is encouraged to "UPGRADE AT ANY TIME" to earn more money.

131.   Almost all participants join at the Elite level lured by the promise of passive residual income, but Wings Network promoters apply constant pressure to upgrade beyond the Consultant (Elite package) level by paying in additional sums to advance to higher levels that have higher residual income payouts.

132.   In addition, none of the materials, websites or promoters give specific information about the product, including basic information such as the price of the subscription or how royalties are obtained on electronic content that is neither licensed or owned by Wings Network.

133.   No financial, accounting or sales product information is made available to the Massachusetts participants.

134.   Wings Network presentations and websites state that participants may join by purchasing a membership for $49.00 and earn money on product sales. However, Wings Network marketing materials and promoters state, "$49 one-time registration, plus the selection

of one of three packages, all of which include varying levels of services and compensation plans" indicating that purchase of the membership alone is not an option.

135.   The Defendants claim that purchase of the membership package entitles the participant to 50% of the profits from the sale of products.

136.   Although the $49.00 membership level looks available on paper it is not offered to any prospective investor. Instead, the $49.00 membership is described to investors as a one-time fee that attends the purchase of each of the three starter packages.

137.   Additionally, the way that promoters present the different package levels demonstrates that purchasing the $49.00 membership alone is impossible.

138.   Also, the Pre-Registration form lists only the Start, Executive, and Elite packages as-options and calls the $49.00 a "one time membership fee" that is to be "added to the package."

139.   The defendants do not encourage the purchase of any package other than the Elite package.

140.   The defendants promise in their marketing materials that the Elite package purchaser is to "earn $750 per month through the first year of activity" by merely adding two participants at the Elite package level to an individual's team.

141.   None of the known Massachusetts investors received $750.00 in the first month or the first year despite fulfilling the requirement to sponsor two participants at the Elite package level to their team.

142.   Some Massachusetts investors questioned the defendants regarding the $750.00 per month that they were told was guaranteed income, but received no answers.

143.   The Wings Network information that was intentionally misrepresented or omitted as to material that Wings Network investors should have been provided because reasonable investors would have wanted to know this information prior to investing.

144.   The defendants had a duty to correct any misrepresentations and provide complete and accurate information to investors.

145.   The defendants knew or should have known that information provided to investors and prospective investors was incomplete and/or misleading and/or false.

## E.   Unregistered and Non-Exempt Offering

146.   The defendants individually and through the defendant corporations offered and sold securities in the form of packages that included an online subscription service that enables downloads of electronic content. Each package offered promised returns in the form of points that could be redeemed in cash.

147.   Investors earn the points/cash by recruiting new members or they can earn points/cash passively through residual income based on the growth of Wings Network and its profits.

148.   To earn guaranteed minimum of $750.00 per month, investors must have purchased the Elite package and signed up two other participants at the Elite level.

149.   The packages and points are securities in the form of investment contracts. They represent an investment of money in a common enterprise with the expectation of profits to be derived mainly from the efforts of a third party. The investment is primarily an investment in the efforts of promoters and other participants to constantly expand membership in Wings Network through individual and group marketing campaigns.

150.   The defendants failed to register or seek an exemption from registration filing for Wings Network, which was required by law.

**F.**   **Unregistered and Non-Exempt Sellers**

151.   The defendants Wings Network, WingsNetwork, Wings Network.com, Wingsnetworkglobal.com; Tropikgadget; Success Wealth 101, Inc., and Grupo Internacional are not registered as broker-dealers or investment advisers in the Commonwealth of Massachusetts or with any federal agency.

152.   The individual defendants are not registered as broker-dealers, broker-dealer agents, or investment advisor representatives in the Commonwealth of Massachusetts or with any federal agency.

153.   The defendants indirectly and directly received compensation for the solicitation and sale of securities in the Commonwealth.

154.   The defendants indirectly and directly received compensation for advising Massachusetts investors on purchases of Wings Network securities.

155.   The defendant banks, JP Morgan Chase, N.A. and Wells Fargo, N.A., knowingly aided and abetted the unlawful, unfair and deceptive pyramid scheme and knowingly received and executed fraudulent funds' transfers and violated mandatory bank reporting any suspicious activities reporting and failed to even do a cursory due diligence as t o DRFR and its principals.

156.   The defendant banks have also aided and abetted other pyramid schemes in Massachusetts, such as, but not limited to, TelexFree and DFRF Enterprises, LLC (See, in re Telexfree Securities Litigation, U.S. District Court, District of Massachusetts, MDL No. 4:14-MD-2566-TSH).

157.   The defendant banks provided crucial financial services to the defendants, which enabled them to carry on its unlawful, unfair and deceptive pyramid scheme.

158.   The defendant banks assisted Wings in the payment processing services and knowingly participated in and aided and abetted Wings' pyramid scheme by:

      a.    Receiving transfers of funds from, and on behalf of, Wings in Wings' fraudulent business, despite knowledge of the fraudulent nature of Wings' business enterprise;

      b.    Processing payments to, and on behalf of, Wings and its founders and management, in Wings' fraudulent business, despite knowledge of the fraudulent nature of Wings' business enterprise;

      c.    Transferring funds from and out of Wings' accounts, despite knowledge of the fraudulent nature of Wings' business enterprise and

      d.    Otherwise enabling Wings' Pyramid Scheme to expand and continue by providing necessary financial services to Wings, despite actual knowledge of fraud by Wings.

      e.    Transferring funds from Wings' accounts to the founding defendants' individual accounts.

159.   Despite knowledge of the fraudulent nature of Wings' business operations, the defendant banks continued to provide Wings with banking services until Wings was shut down by the Massachusetts Securities Division.

160.   The bank defendants are "financial institutions under the terms of the Bank Secrecy Act, 31 U.S.C. § 5312.

161.    The bank defendants had an affirmative obligation to file Suspicious Activity Reports with the Financial Crimes Enforcement Network of the U.S. Department of the Treasury and other appropriate federal law enforcement agencies, pursuant to the terms of the Bank Secrecy Act and Regulations, 31 U.S.C. § 5312 and 12 CFR § 21.11.

162.    The bank defendants are obligated by applicable federal statutes and regulations, including, without limitation, 31 C.F.R. § 103.121 (amended 31 C.F.R. § 1020, et seq.), to acquire information sufficient to know the true identities, nature of business activities, customer base, and product offerings of all entities to which it provides financial services or access to the national banking system.

163.    Pursuant to this required "know-your-customer" analysis, as required by 31 C.F.R. § 103.121 (amended 31 C.F.R. § 1020, et seq.), The bank defendants were required to collect information sufficient for it to determine whether Wings or any of its other customers involved with Wings posed a threat of criminal or other improper conduct.

164.    The bank defendants and their respective board of directors are also obligated by applicable federal statutes and regulations, including, without limitation, the Bank Secrecyy Act, 31 U.S.C. § 5311 et seq., the USA Patriott Act, § 326, 31 U.S.C. § 5318, and 31 C.F.R. § 1020 et seq., to implement effective procedures to prevent them from providing financial services or access to the national banking system, to entities engaged in illegal activities such the Wings Pyramid/Ponzi scheme.

165.    The bank defendants also knowingly, or with willful ignorance, failed, refused or neglected to perform proper "know-your-customer" analysis with respect to Wings,  as required by C.F.R. § 103.121 (Amended 31 C.F.R. § 1020, et seq.

166.    Furthermore, the bank defendants failed, refused or neglected to implement effective policy and procedures to prevent such defendant from providing financial services and access to the national banking system to Wings and the defendants and John Doe Inside Promoters, as required by the Bank Secrecy Act, 31 U.S.C. § 5311 et seq.; the USA Patriot Act, § 326, 31 U.S.C. § 5318; and 31 C.F.R. § 1020 et seq.

**John Doe Inside Promoters who Acted as Wings' Agents**

167.    Although they remain unknown to plaintiff and the Putative Class Representatives and will remain unknown until discovery has been exchanged, certain promoters were provided with inside information by defendants and acted as agents and servants of defendants.

168.    The plaintiff and the Putative Class Representatives seek to obtain damages, restitution and injunctive relief for the Class, as defined, below, from defendants.

### III.  CLASS ACTION ALLEGATIONS

169.    Under Rule 23 of the Massachusetts Rules of Civil Procedure, the plaintiff sues on her own behalf, and on behalf of all other persons similarly situated ("the Class").  The Class that Plaintiff seeks to represent is: All persons residing in the Commonwealth of Massachusetts who purchased membership interests in Wings.

170.    The plaintiff meets the requirements of Massachusetts Rules of Civil Procedures 23(a) because the members of the Class are so numerous that the joiner of all members is impractical.  While the exact number of Class members is unknown to the plaintiff, based on information and belief, it is not less than tens of thousands of people.

171.    The Massachusetts Superior Court has the proper venue and authority and proper venue to hear a so-called G.L. Chapter 93A class action such as this.

172.    The plaintiff meets the requirements of Massachusetts Rules of Civil Procedure 23(a) because the members of the Class are so numerous that the joiner of all members is impractical.  While the exact number of the Class members is unknowns to the plaintiffs based on information and belief, it is in the thousands, with many millions of dollars paid for Wings' interest.

173.    The plaintiff meets the requirements of Massachusetts Rules of Civil Procedure 23(a) because there is a well-defined community of interest among the members of the Class, common questions of law and fact predominate, plaintiff's claims are typical of the members of the Class, and plaintiff can fairly and adequately represent the interests of the Class.

174.    This action satisfies the requirements of Massachusetts Rule of Civil Procedure 23(b)(3) because it involves questions of law and fact common to the member of the Class that predominate or questions affecting only individual members, including, but not limited to:

a.      Whether Wings ran an unlawful pyramid scheme or a legitimate business;

b.      Whether Wings ran a lawful Multi-Level Marketing program;

c.      Whether defendants knew or should have known that Wings was an illegal pyramid scheme, continued to aid, abet and further such illegal activities or are otherwise liable for the economic loss suffered by the Putative Class;

d.      Whether the bank defendants knowingly aided and abetted Wing's pyramid scheme;

e.      Whether Massachusetts' Unfair Trade and Deceptive Acts, M.G.L. c. 93A will apply to the claims of the Putative Class;

   f.     Whether Massachusetts' Blue Sky Laws will apply to the claims of the Putative Class;

   g.     Whether certain defendants used and employed manipulative and deceptive devices and contrivances in violation of MGL 110A, Sec. 410; used means and instrumentalities, directly and indirectly, for the purchase and sale of unregistered securities; and used and employed manipulative and deceptive devices and contrivances in violation of the Massachusetts Uniform Securities Act, MGL c. 110A, Section 410(b) and MGL 93A;

   h.     Whether the Wings related defendants violated Section 1965 of the Racketeer Influenced and Corrupt Organizations Act [18 U.S.C. § 1965];

   i.     Whether Wings mailed fraudulent and inaccurate forms to investors;

   j.     Whether the defendants' conduct violated any of the articulated Massachusetts state common laws; and

   k.     Whether the plaintiff and the class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

175.    The plaintiff's claims are typical of those of other Class members because plaintiffs was defrauded by defendants' scheme.

176.    The plaintiff will fairly and accurately represent the interests of the Class.

177.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications regarding individual members of the class, which would establish incompatible standards of conduct for the Defendants and would lead to repetitive adjudication of common questions of law and fact.

178.    Class treatment is superior to any other method for adjudicating the controversy. Plaintiff knows of no difficulty likely to be encountered in the management of this litigation that would preclude its maintenance as a class action under M.R.C.P. No. 23(b)(3).

179.    Damages for any individual class member likely cannot justify the cost of individual litigation, so that absent class treatment, the defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

180.    Defendants have acted or refused to act on grounds that apply to the class, as alleged above, and certification is proper under Rule 23(b)(2).

## IV.  CLAIMS FOR RELIEF

### COUNT I

### (Violations of Massachusetts General Laws, Chapter 93A, Sections 2 and 11)

The plaintiff incorporates by reference all allegations in all previous paragraphs, as though fully set forth here.

181.    The defendants were all engaged in "trade" and "commerce" in Massachusetts as defined by Massachusetts General Laws Chapter 93A, Section 1.

182.    The plaintiff and the Putative Class were engaged in "trade" and "commerce" as defined by Massachusetts General Laws Chapter 93A, Section 1.

183.    The foregoing transactions, actions and inactions of defendants constitute unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General Laws, Chapter 93A, §§ 2 and 11.

184.    In consequence of defendants' unfair and deceptive acts and practices, Plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

-32-

## COUNT II

### (Negligence)

The plaintiff incorporates by reference all allegations in all previous paragraphs, as though fully set forth here.

185.    The banking defendants owed a duty to plaintiff and the Putative Class to act with a level of reasonable care to avoid misstating, misrepresenting or being misleading about the true nature of Wings' operation and its financial information or its returns, and to comply with all laws.

186.    By misstating and omitting relevant information, including the source of and sufficiency of funds for payments to promoters, the defendants breached their duty of care owed to plaintiff and the Putative Class.

187.    The bank defendants failed to monitor the Wings' accounts, inquire further and to take reasonable steps to prevent a diversion of funds or perpetration of a fraudulent scheme.

188.    The plaintiff and the Putative Class relied upon defendants' expertises and/or performance of their duties in becoming promoters for the pyramid scheme.

189.    The plaintiff and the Putative Class reposed faith, confidence and trust in defendants' representations and advice.

190.    As a direct and proximate result of the defendants' negligence and carelessness, plaintiff and the Putative Class have been caused to suffer and sustain damages and losses.

## COUNT III

### (Negligent Misrepresentation)

The plaintiff incorporates by reference all allegations in all previous paragraphs, as though fully set forth here.

191.    The defendants directly, and through their agents, servants, employees and/or representatives, negligently made false misrepresentations of material fact and omissions to plaintiff and the Putative Class in the course of their businesses with the misrepresentations being made to obtain and/or wrongfully appropriating and converting money from plaintiff and the Putative Class.

192.    The defendants made negligent misrepresentations and omissions although said defendants knew, or should have known, that such representations were false.

193.    Said representations and statements were material and were relied upon by the plaintiff and the Putative Class, inducing them to furnish money to the defendants.

194.    In consequence of the reliance on the negligent misrepresentations of the said defendants, plaintiff and the Putative Class have suffered great financial losses, have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

## COUNT IV

### (Fraud)

The plaintiff incorporates by reference all allegations in all previous paragraphs, as though fully set forth here.

195.    The defendants directly, and through their agents, servants, employees and/or representatives, did intentionally make false representations and omissions of material fact to plaintiffs and the Putative Class with these misrepresentations being made to obtain and/or wrongfully appropriating and converting money from the plaintiff and the Putative Class.

196.    The defendants' fraudulent misrepresentations and omissions are detailed above and include, but are not limited to:

-34-

a. Providing false and misleading information on the nature of Wings' business operation;

b. Misrepresenting the financial statements;

c. Providing false and misleading information on the value of Wings' assets;

d. Providing false and misleading information on the method and source from which income was derived;

e. Providing false and misleading information on the legality of Wings' business model;

f. Providing false and misleading information on the sustainability of the returns to plaintiff and class members;

g. Providing false and misleading information regarding the investigation in Wings' Brazil, Portugal and Massachusetts operations;

h. Knowingly participating in false and deceptive information televised over the internet and other media;

i. Failing to comply with federal and state laws; and

j. Employing legal and accountant counsel to mask their illegal and fraudulent activities to further and perpetuate such illegal fraudulent activities.

197. The defendants knew or should have known of the fraudulent and deceptive misrepresentations and omissions of material facts set forth.

198. The defendants made these intentional misrepresentations although the defendants knew that such representations were false for the purpose of inducing plaintiffs and the Putative

Class to purchase initially and to continue to purchase Wings' interests and to recruit new members.

199.    Such misrepresentations and omissions were done knowingly for the additional purpose and effect of concealing the true information about the Wings' program, including its financial condition and operations.

200.    The defendants received information reflecting the facts regarding Wings' business practices and exercised control over the materially misleading misstatements.

201.    Because of their control over and/or association with the Wings's program, the defendants were active and culpable participants in the fraudulent scheme.

202.    The defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to promoters and potential promoters.

203.    The ongoing fraudulent pyramid scheme could not have been perpetrated without the knowledge and complicity of said defendants.

204.    These misrepresentations and statements were material and were relied upon by the plaintiff as true, inducing them to furnish money, directly or indirectly, to said defendants and recruit new members.

205.    In consequence of the reliance on the intentional misrepresentations, plaintiff and the Putative Class have paid artificially inflated prices for worthless membership interests, suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged during the Class Period.

## COUNT V

### (Unjust Enrichment)

The plaintiff incorporates by reference all allegations in all previous paragraphs, as through fully set forth here.

206.    The plaintiff and the Putative Class furnished funds, directly or indirectly, to defendants, who accepted them without protest or defect and retained and benefitted from them.

207.    Defendants knew of such funds received by them.

208.    Defendants have unlawfully and in bad faith denied plaintiff and the Putative Class access to such funds, and have instead knowingly retained the benefit of such funds for themselves.

209.    As a direct and proximate result of defendants' actions, as hereinabove set forth, defendants were unjustly enriched.

## COUNT VI

### (Tortious Aiding and Abetting)

The plaintiff incorporates by reference all allegations in all previous paragraphs, as through fully set forth here.

210.    Each defendant provided substantial assistance or encouragement to the other defendants in committing the primary causes of action alleged herein, and did so with unlawful intent and knowledge that such parties were perpetuating an illegal Pyramid Scheme yet continuing to substantially assist or encourage.

211.    Defendants rendered this substantial assistance despite their knowledge that Wings' operations constituted an unlawful, unfair, deceptive and unsustainable Pyramid Scheme and financial fraud.

212.    Such substantial assistance rendered by defendants despite their knowledge of, or with reasonable diligence they should have known of, the illegal nature of Wings' operations, is detailed above and includes, but is not limited to:

a.    Managing and controlling Wings and its affiliated entities;

b.    Providing banking, investment and asset management services for Wings and its management;

c.    Promoting Wings' advertising materials; and

d.    Processing payments to, from, and on behalf of Wings and its affiliated entities.

213.    By each defendant's actions participating in the pyramid scheme, as alleged above, each said defendant aided and abetted the commission of the causes of action alleged herein.

214.    As a direct and proximate result of Wings' illegal pyramid scheme and all the activities performed in connection therewith, to which defendants provided substantial assistance, plaintiff and the Putative Class sustained damages and losses.

-38-

## COUNT VII

### (Civil Conspiracy)

The plaintiff incorporates by reference all allegations in all previous paragraphs, as through fully set forth herein.

215.   The defendants agreed or commonly designed to engage in the unlawful pyramid scheme and further its activities.

216.   As detailed above, each of said defendants engaged in a tortious act in furtherance of the agreement or common design to engage in the lawful Pyramid Scheme.

217.   The defendants, for an unlawful purpose and using unlawful means, with the intent of so combining, unlawfully defrauded plaintiff and the Putative Class out of funds.

218.   In consequence of the foregoing, plaintiff and the Putative Class sustained damages and losses.

## COUNT VIII

### (Violations of RICO, 18 U.S.C. § 1962(b)(c)2(d))

The plaintiff incorporates by reference all allegations in all previous paragraphs, as through fully set forth herein.

219.   Beginning in at least as early as 2013 and continuing thereafter until stopped by the Massachusetts Securities Division in May, 2014, Wings constituted an "enterprise" (the "Wings Enterprise"), as defined in 18 U.S.C. § 1961(4).

220.   During or about the respective time periods, the Wings Enterprise engaged in interstate and foreign commerce, and its activities have affected interstate and foreign commerce.

221.   Beginning in at least as early as 2013 and continuing thereafter to May, 2014, Wings and the defendants, being persons or entities associated in fact with the Wings Enterprise,

conducted or participated, directly or indirectly, in the conduct of the Wings Enterprise's affairs through a pattern of racketeering activity, as set forth below, in violation of RICO, 18 U.S.C. § 1962(c).

222.   Additionally, beginning in at least as early as 2013 and continuing thereafter until May, 2014, the defendants aided and abetted Wings in its conduct described in the previous paragraph, through a pattern of racketeering activity, as set forth below, in violation of RICO, 18 U.S.C. § 1962(c).

223.   The RICO defendants are distinct from the Wings Enterprise. Each defendant has performed particular racketeering acts, but each defendant is a separate individual or entity from the Wings Enterprise.

224.   One of the purposes of the pattern of racketeering was, through mail and wire fraud, and transportation and possession of converted funds to conduct the affairs, directly or indirectly, of the Wings Enterprise, or to aid and abet such conduct, and to further their own economic interests.

225.   The racketeering acts of mail and wire fraud and transportation and possession of converted funds also were part of the Wings Enterprise's goal to (a) purchase Wings memberships, (b) to recruit additional members, (c) promote the Wings Program, and (d) join the pyramid scheme and cause others to join and to reap financial gains for themselves.

226.   The pattern of racketeering activity alleged herein is distinct from the Wings Enterprise.

227.   The pattern of racketeering activity has included acts of mail and wire fraud and transportation and possession of converted funds, to wit:

228.   Beginning in 2013, for the purpose of executing the pyramid scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, as set forth above, Wings unlawfully, willfully, knowingly and recklessly placed and caused to be placed in the United States mail, or took or received therefrom, or aided and abetted the placement or receipt of matters or things consisting of, among other things, Wings' products and literature, correspondence related to the Wings Network Enterprise, promotional literature, brochures, money, and checks to plaintiffs and the Putative Class, in violation of 18 U.S.C. § 1341.   It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent pyramid scheme.

229.   Beginning in 2013, for the purpose of executing the Pyramid Scheme to defraud, or to obtain money or property by means of false or fraudulent pretenses, representations or promises, as set forth above, the defendants and others unlawfully, willfully, knowingly and recklessly have transmitted, caused to be transmitted, or aided and abetted the transmission by means of wire, radio, television, or internet communications in interstate or foreign commerce, certain materials promoting and executing the pyramid scheme on Internet web sites, by facsimile and telephone, including promotional materials, registration information, product information and invoices, and the execution of the purchase of memberships by plaintiff and the Putative Class, in violation of 18 U.S.C. § 1343.

230.   In addition, the foregoing individuals and entities knowingly and recklessly placed or caused to be placed, or aided and abetted the placement, of these and other misleading information and material on websites on the Internet and sent these misleading materials through interstate or foreign wire communications.

231.    Beginning in 2013 and continuing thereafter to May, 2014, Winks and the other defendants have transported, transmitted or transferred in interstate and/or foreign commerce money in excess of $5,000, knowing the same to have been stolen, converted and/or taken by fraud, in violation of 18 U.S.C. § 2314.

232.    Beginning in 2013 and continuing thereafter to May, 2014, Wings and the other defendants possessed money of plaintiff and the Putative Class in excess of $5,000, knowing the same to have crossed a state or United States' boundary after being stolen, unlawfully converted, or taken, in violation of 18 U.S.C. § 2315.

233.    Each such offense has constituted a separate predicate act of racketeering, which has been part of the pattern of racketeering activity through which said defendants conducted the affairs, directly or indirectly, of the Wings Network Enterprise, or aided and abetted such conduct.

234.    The racketeering acts set forth below, and others all had the same pattern and similar purpose of defrauding plaintiff and the Putative Class for the benefit of said defendants.

235.    More specifically, the conduct that comprised the racketeering includes, but is not limited to, all the acts alleged above, as well as the acts described below.

### Mail Fraud

236.    The pyramid scheme was furthered by the use of the United States mail. Wings and the other defendants each had a specific intent to defraud by devising participating in or abetting the scheme.

237.    It was part of this pattern of racketeering activity that each said defendant committed various acts of mail fraud, as described in detail above in violation of 18 U.S.C. § 1341, thereby directly and foreseeably injuring plaintiff and the Putative Class.

-42-

## Wire Fraud

238.    The pyramid scheme was furthered by the use of interstate and international wire transmission facilities.    Wings and the defendants each had a specific intent to defraud by devising participating in or abetting the scheme.

239.    It was part of this pattern of racketeering activity that each said defendant committed various acts of wire fraud, as described in detail above in violation of 18 U.S.C. § 1343, thereby directly and foreseeably injuring plaintiff and the Putative Class.

## Transportation and Possession of Stolen Property

240.    Each of the defendants knew or recklessly disregarded that the proceeds obtained from the defendants, as described in detail above, had been converted as of the time each was received into Wings and/or said defendants' accounts, because defendants knew that plaintiffs and the Putative Class had an immediate, superior right to possession or ownership of the funds and that the reception of such funds deprived the plaintiff and the Putative Class of their possessory or ownership interests in them.

241.    It was part of this pattern of racketeering activity, as described in detail above, that on multiple occasions said defendants transported, transmitted or transferred in interstate or foreign commerce money of a value in excess of $5,000, knowing the same to have been stolen, converted or taken by fraud, thereby directly and foreseeably injuring plaintiffs and the Putative Class, in violation of 18 U.S.C. § 2314.

242.    It was as part of this pattern or racketeering activity that each Defendant knew of the acts described in the previous paragraph, and knowingly and intentionally provided substantial assistance to Wings, thereby directly and foreseeably inuring Plaintiffs and the Putative Class, in violation of 18 U.S.C. §§ 2 and  2315.

243.   Such illegal and wrongful behavior constitutes "racketeering activity" as defined by 18 U.S.C. 1961(1).

244.   Said defendants are associated with the Wings Network Enterprise.

245.   In violation of 18 U.S.C. § 1962(c), said defendants conducted and/or participated in the conduct of the affairs of the Wings Network Enterprise, including, but not limited to, participation in activities in furtherance of the Pyramid Scheme, through a pattern of racketeering activity.

246.   In engaging in the foregoing mail and wire fraud and transportation and possession of stolen property, said defendants knew plaintiffs and the Putative Class would reasonably rely on their representations and omissions which would result in plaintiffs and the Putative Class joining the fraudulent Pyramid Scheme.

247.   Said Defendants knew that the misrepresentations and omissions described above in promoting and executing the Pyramid Scheme were material because they caused plaintiffs and the Putative Class to join and participate in the illegal pyramid scheme.

248.   Had plaintiffs and the Putative Class known that said defendants were promoting a fraudulent pyramid scheme, they would not have joined it.

249.   Defendants' acts of mail and wire fraud and transportation and possession of stolen property were a proximate cause of injuries that plaintiffs and the Putative Class suffered.

250.   In consequence of said defendants' unlawful enterprise and pattern of racketeering activity plaintiffs and the Putative Class have suffered great financial losses, and have also incurred considerable expenses and loss of income, and have otherwise been greatly damaged.

## COUNT IX

### (Violations of Massachusetts General Laws, Chapter 110A, Section 410(b))

The plaintiffs incorporate by reference all allegations in all previous paragraphs, as through fully set forth herein.

251.   At the time of the wrongs alleged, the defendants were each a controlling person, partner, officer, director, person occupying a similar status, or employee materially aiding in the sale of securities, of Wings within the meaning of Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

252.   By their respective positions of authority, the defendants had the power and authority to influence and control, and influenced and controlled, the decision-making and activities of Wings caused them to engage in the wrongful conduct described and violations of Section 410(a) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

253.   The defendants actively participated in the leadership and decision-making process of the selling entity causing the dissemination of false and misleading statements and omissions of material facts.

254.   By their positions as controlling persons, partners, members and agents of DFRF, and because of the aforementioned conduct, said defendants are liable under Section 410(b) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

255.   In addition, the defendants materially aided in the sales of the fraudulent securities in violation of Section 410(a) of the Massachusetts Uniform Securities Act, M.G.L. c. 110A.

256.   Said defendants made significant contributions toward making the sales to the plaintiffs and the Putative Class possible through their actions detailed above.

257.   Said defendants prepared and provided information on, endorsed and actively promoted the opportunity regarding the securities on websites and at Wings events. Each of the said defendants provided print materials, electronic materials, and made oral representations to the Putative Class

258   The stated defendants are liable under 410(b) as a primary violation by DFRF was under 410(a), Defendants materially aided in the sale of unregistered securities, and knew, or by reasonable diligence should have known, of the primary violation.

259.   Said defendants are jointly and severally liable for the primary violations detailed under Section 410(a)(2) above.

260.   Plaintiff and the Putative Class seek the award of actual damages on behalf of the Class.

## V. PRAYERS FOR RELIEF

WHEREFORE, plaintiff, on behalf of herself and the Class, pray for judgment as follows:

1.   Declaring this action to be a Class Action properly maintained under the Massachusetts Rules of Civil Procedure and certifying the plaintiff as the class representative;

2.   Awarding the plaintiffs and Class Members rescission and/or compensatory damages against Defendants for all damages sustained because of their wrongdoing, in an amount to be proven including interest;

3.   For an award of actual damages, compensatory damages, statutory damages, punitive damages, and statutory penalties, in an amount to be determined;

4.   For an award of punitive damages;

5.   For an award of costs of suit and attorneys' fees, as allowable by law;

6.    For an award of interest;

7.    To appoint a receiver selected by Class Counsel and an accounting; and

8.    For an award to the plaintiff and the Class of such other and further relief as may
be just and proper under the circumstances including injunctive and equitable relief.

## DEMAND FOR JURY TRIAL

The plaintiff and the Putative Class demand a jury trial of their claims to the extent
authorized by law.

Respectfully submitted,

VIVIANE RODRIGUES, Individually and
On Behalf of Class Members, Plaintiff

By her Attorney

Evans J. Carter, Esq. (BBO #076560)
Evans J. Carter, P.C.
860 Worcester Road, 2nd Floor
P.O. Box 812
Framingham, MA 01701
(508) 875-1669
ejcatty1@verizon.net

DATED:   January 15, 2015

-47-

Pyramid Scheme | Investor.gov



Investor.gov
U.S. Securities and Exchange Commission

## Pyramid Scheme

In the classic "pyramid" scheme, participants attempt to make money solely by recruiting new participants. The hallmark of these schemes is the promise of sky-high returns in a short period of time.

Sometimes there is no product involved at all, with individuals simply asked to hand over their money, with the promise to others doing the same. The fraudster pays early stage investors with money received from later investors to make the scheme look legitimate.

Ponzi and pyramid schemes are closely related because they both involve paying longer-standing members with money from new participants, instead of actual profits from investing or selling products to the public, neither type of scheme lasts.

| | Pyramid Scheme | Ponzi Scheme |
|---|---|---|
| Typical "hook" | Earn high profits by making one payment and finding a set number of others to become distributors of a product. The scheme typically does not involve a genuine product. The payout occurs over time. | Earn high investment returns with little or no risk by simply handing over your money; the investment typically does not exist. |
| Payments | Must pay a one-time or recurring participation fee and recruit new distributors into the scheme. | No recruiting necessary to receive payments. |
| Interaction with original promoter | Sometimes none; new participants may enter program at different levels. | Promoter generally interacts directly with all participants. |
| How victims realize they don't profit | If able, participants try to recoup their investments by recruiting new participants. | If able, investors generally ask promoters to return their money. |
| Collapse | Fails when recruitment slows. | Fails when too many investors request payments. |

### Additional Information

Investor Alert: Beware of Pyramid Schemes Posing as Multi-Level Marketing Programs

EXHIBIT
A



CERTIFIED MAIL

7013 2250 0002 0843 5736

Evans J. Carter, P.C.
P.O. Box 812
Framingham, MA 01701

President and CEO
Wells Fargo Bank, N.A.
420 Montgomery St
San Francisco, CA 94104-1207

RETURN RECEIPT REQUESTED





$3.29
US POSTAGE
First-Class
07292
US000113305

www.pbSmartPostage.com